THE MARYLAND INSURANCE COMPANY *vs.* JOSEPH S. BOSSIERE.—*December,* 1837.

In the construction of a contract of insurance, as in other cases, the intention of the parties, when it can be ascertained, must govern their rights under it. The order when adopted into the policy, forms a part of it, and is to be adverted to, and considered in giving it a construction.

It is an established principle in the law of insurance, that the underwriters are presumed to be acquainted, with the nature and course of the voyage, which they undertake to insure.

Where insurance was effected on a cargo, at and from St. A. with liberty of two ports on the Spanish main, and at and from any of them to B, by a policy subscribed on the 4th day of April, 1831, upon an order therein referred to, as follows :

$4,500 insurance is wanted, on cargo of schooner *Argonaut, Captain Maginney,* at and from *St. Andreas,* with liberty of two ports on the Spanish main, and at and from any of them to Baltimore, with a return for each port not used. *Captain Drinkwater,* of the schooner *Desiah,* arrived here a few days since from *San Blas,* and reports that the *Argonaut* sailed from *San Blas* for *St. Andreas* about the middle of February to trade, which is the last account received of her proceedings—and the loss occurring on the voyage from *San Blas* to *St. Andreas,* it was *held* that the insurers were not liable, the loss happening before the risk commenced.

The order for the insurance was intended to define with certainty the voyage to be insured, and to obviate all mistake upon that subject.

The authority to commissioners to take testimony is special, and must be strictly pursued.

Evidence taken under a commission in which a different person from one of the commissioners named therein acted, rejected as inadmissible.

Commissioners have no authority to propound any questions to the witnesses but those which are sent out with the commission, and the answers to such questions should not be suffered to go to the jury.

APPEAL from *Baltimore* county court.

This was an action of *Covenant*, brought by the appellee on the 23d September, 1833, against the appellants. The declaration was for a total loss. The defendants pleaded that they had not broken their covenant, and filed the following agreement with the plaintiff.

It is agreed that under the plea of *non infregit conventionem*, filed in this cause, the defendants may rely upon any or all of the following defences :

1. That the policy in question did not attach.

2. That the order for insurance given by the plaintiff, through his agent, *Henry Thompson*, and the policy made by the defendants in pursuance thereof, constitute the contract, which applies only to a voyage commencing at *St. Andreas*, after the first day of February, 1831.

3. That if the policy did attach, the underwriters have been discharged by the deviation of the vessel.

4. That the plaintiff, to recover a verdict, must establish the identity of the voyage made by the vessel, with the voyage indicated in the contract with the defendants, arising from the order for insurance, and the policy.

5. That there has been no proof of loss and adjustment thereof, such as is required by the policy in question, and that these are indispensably preliminary to any action brought to recover such a loss as is claimed in this action.

At the trial of this cause, the plaintiff, to support the issue on his part, gave in evidence a policy of insurance, viz :—" By the *Maryland Insurance Company*, (No. 12,895.) Whereas, *Henry Thompson, as per order*, doth make insurance, and cause himself to be insured, lost or not lost, at and from *St. Andreas*, with liberty of two other ports on the Spanish main, and at and from any of them to *Baltimore*,

upon all kinds of lawful goods and merchandises, laden or to be laden on board the good schooner called the *Argonaut*, whereof is master for the present voyage, *Maginney*, or whosoever shall go for master in the said vessel—beginning the adventure upon the said lawful goods and merchandises from and immediately following the loading thereof, on board of said vessel at *St. Andreas* aforesaid, and so shall continue and endure until the said goods and merchandises shall be safely landed at *Baltimore* aforesaid; and it shall and may be lawful for the said vessel, in her voyage, to proceed and sail to, touch and stay at, any ports or places, if thereunto obliged by stress of weather or other unavoidable accident, without prejudice to this insurance. Touching the adventures and perils which we, the assurers are contented to bear and take upon us in this voyage; they are, of the seas, &c. And in case of loss, the same will be paid in ninety days after proof and adjustment thereof; the amount of the note given for the premium, if unpaid, being first deducted. In witness whereof, the *Maryland Insurance Company* have, by their president, subscribed the sum insured, and caused their common seal to be annexed to these presents, in *Baltimore*, the fourth day of April, one thousand eight hundred and thirty-one.

And also proved the order therein referred to as follows: memorandum, &c.

"4,500 dollars insurance is wanted on cargo of schooner *Argonaut*, *Captain Maginney*, at and from *St. Andreas*, with liberty of *two other* ports on the Spanish main, and at and from any of them to *Baltimore*, with a return for each port not used. *Captain Drinkwater*, of the schooner *Desiah*, arrived here a few days since from *San Blas*, and reports that the *Argonaut* sailed from *San Blas* for *St. Andreas*, about the *middle of February*, to trade, which is the latest account received of her proceedings.   HENRY THOMPSON.

4th April.—3½ per cent. to return ¾ per cent. for each port on the main not used.

Agreed, for whom it may concern.   H. T.

Also, the following deposition,—" Be it remembered, that on this 8th day of November, 1834, at the city of Baltimore, before me, personally appeared *Robert S. Upshur*, witness for the plaintiff, in a certain civil cause now depending in *Baltimore* county court, wherein *Joseph S. Bossiere* is plaintiff, and *The Maryland Insurance Company* is defendant—and deposeth and saith, that he was on board the schooner *Argonaut*, on her voyage from *Baltimore* to the *Spanish* main, in the fall of the year, 1830. She arrived at *Porto Bello*, on that coast,—in that port she discharged part of her cargo; how much, he cannot say, but remembers that some soap was landed. She left that place, sailed along the coast, touched at several places at which she landed articles and received money in pay for them, returned her course until off *Porto Bello*—did not enter, but landed some cargo there, and received money for it. From *Porto Bello* proceeded to *Chagres*, laid there two or three days, discharged some cargo, and received money in pay for it; from *Chagres* proceeded to *San Blas* coast, put in at *San Blas*, discharged one hundred barrels of tobacco for safe keeping, proceeded thence for *St. Andreas*—on her passage the vessel sprung a leak—took out some cargo at *St. Andreas* to discover the leak,—found and stopped it; cargo was sold, landed, and money received in pay for part of it, but does know that it was for all. From *St. Andreas*, proceeded to the *Spanish* coast or main,—on this passage the vessel sprang a leak the second time, and upon consultation, it was thought wisest to go into *Bocotoro*, and heave her out, which was done—this happened on Sunday. The cargo being all discharged for that object, she was then caulked, and the leak was properly stopped, and then cargo was taken again on board, and she proceeded to *San Blas*,—on her passage thither, deponent saw the town of *Chagres* on fire—touched no where on this passage before she entered *San Blas*—laid in this port one day and night,—in the morning, very early, got under way,—where bound, deponent did not understand rightly—but after getting pretty well clear of the land, found themselves among breakers,

where they were capsized—the cargo had shifted, and the vessel was completely useless—the wind and current set on shore, and they drifted on shore in that condition—it was about one hour before day-light when she struck, and bilged directly; we set all hands to work to save what we could—secured some cargo, and a trunk that contained some money —the amount this deponent does not know—the trunk was delivered into the care of the captain and mate, the super-cargo having been drowned when the vessel was capsized—the trunk that contained the money was stolen from under the mate's head, and deponent saw, in the morning, some of the money scattered on the ground near the tent from which the money was stolen—the amount about seven or eight dollars ; he does not know by whom the trunk was stolen—the tent was surrounded by the natives, who stole much of the cargo that had been saved or landed; deponent went and searched for the trunk in a swamp close by, but in vain. The natives showed so much hostility towards deponent and the crew generally, that they concluded that it was necessary to their own safety to depart—and they accordingly made the best of their way home. Deponent remembers that there was some tortoise shell on board the vessel when she was lost, and he recollects that they took some money on board at the first port at which they stopped, but does not know whether it was the custom or course of trade to take money or shells on board as returns of previous voyages, his station in the employ not having given him the opportunity of gaining such information. The cargo that was taken out at *St. Andreas*, but not sold, was replaced on board—he does not recollect the taking any tortoise shell on board,—it could not be taken on board without his knowing it;—he was absent on shore sometimes, however, and articles might have been brought on board without his knowing the fact. They had not convenient place to heave out at *St. Andreas* to repair; when the leak was attended to at *St. Andreas*, it was completely stopped; he does not recollect whether the second leak occurred in the same part or place—they had not reached the

Spanish coast when it happened; at the consultation, *Boco-toro* was considered the nearest and best place at which the vessel could be repaired.    On quitting *San Blas,* before the vessel capsized, *her* course was homewards, being the same as if bound to *St. Andreas;* but he does not know her then destination.    The trunk saved, that contained money, he thought from its weight, must have had several thousand dollars in it.

Also, the following commission and return, viz: &c.

[The reporters do not insert the evidence taken under this commission, because evidence of a similar tendency will be found in the other proof of the plaintiff, and because the commission in consequence of the substitution of the name of *Torquil Bowie* (by the alcalde who administered the oaths at *San Andreas* to the commissioners who acted,) for the name of *Duncan Bowie* which was in the commission when it issued from *Baltimore* county court, was rejected as inadmissible by this court.]

The plaintiff then called *Edward Maginney,* by whom he gave evidence, that he sailed from *Baltimore* as master of the schooner *Argonaut,* in November, 1830,—that he visited several places on the *Spanish main,* and arrived at *St. Andreas,* in December, 1830, or January, 1831, having sprung a leak on his passage from *Chagres* thither:—that, in order to repair the leak, he took out the cargo from the forward part of the vessel, removed as much as he could to the deck, landed the remainder, consisting of dry goods, one dozen chairs, three boxes shoes;—ascertained that the whole of the cargo was in good order.    The leak having been repaired, the cargo was re-laden under the deck, including what had been landed, except a portion which had been sold, comprising the chairs and a small part of the shoes, and part of the dry goods.    A quantity of merchandise, bullion and specie, that is, gold dust, old gold, specie, tortoise shell and cocoa, which had not been before on board the vessel were laden on board.    There is no custom-house at *St. Andreas.*    After a few days stay at *St. Andreas,* the vessel sailed for *Cordea* to trade, on nearing the place of her destination she sprung a leak; she then entered *Cordea,* for the purpose of inspecting

the leak, and getting provisions and water.—There examined the leak,—found that it was such as it was impossible to repair without heaving down, which could not be done there. Remained there no longer than was necessary to examine the leak, and chink it with oakum; left that place without trading, and keeping constant watch over the leak, sailed for *Boco del Toro*, the only place on the coast where there were any facilities for heaving down. Arrived there in about two days;—took out the cargo, loaded it on board *Captain Humphrey's* vessel, then in port, hove the *Argonaut* down, repaired her, reladed the cargo, which was then all found to be in good order, and immediately thereafter, on the third day from their arrival, set sail for *Cordea* upon their voyage, having gone to *Boco del Toro* for no other purpose than repair, and having remained there no longer than was necessary for that purpose, and not having traded, but paid for the repairs in money; on her arrival at *Cordea* they entered upon the business of the voyage, which the leak had before prevented them from attending to. Took in cocoa, tortoise shell, tobacco and specie, the tobacco having been landed there for the purposes of trade, when at the same place, previous to going to *St. Andreas*, and having remained there until now, when received on board the vessel. After a short stay at *Cordea* sailed for home, about eighteen miles from land and before she had shaped her course, or got clear of the reefs in the neighbourhood of the point of *St. Blas*, the vessel by a heavy sea capsized, all hands washed overboard, the supercargo drowned and the papers lost. After drifting twenty-three hours, struck, bilged and went to pieces, in spite of all exertions of the captain and crew. The cargo was lost, with the exception of a few articles of the value of about five hundred dollars. The witness picked up out of the sea, at the time of the wreck, a letter of instructions from the plaintiff to *Mr. Bowie*, the supercargo. The *Argonaut* sailed from *Baltimore* on a voyage to the *Spanish main*, and before her arrival at *St. Andreas* as aforesaid, had visited numerous ports and places of trade on the main;—had discharged two-thirds

of the outward cargo, and taken in nearly the whole of the homeward cargo, consisting of specie, gold and silver plate, cocoa, tortoise shell and gold dust, in pursuance of a necessary and invariable practice pursued by all traders who visit that country; to whom, as well as to all who have any knowledge of the trade, it is well known, that a cargo cannot be obtained at one, two, or three ports. The practice being to commence collecting the outward cargo at the first port of discharge, and to continue collecting it by way of trade or barter, at every place visited during the voyage, which are frequently very numerous, as also, to leave parts of the cargo in the hands of agents for sale at different ports and places, and to return and to collect the proceeds, thus using twelve or more ports on a voyage, and frequently the same port two or three times before completing the collecting of the cargo. The witness identified the following, as the letter of instructions picked up by him out of the sea at the time of the wreck, viz :

MR. JAMES D. BOWIE :        *Baltimore, Nov.* 20, 1830.

SIR,—You will proceed in the schooner *Argonaut, Captain Maginney,* to *Porto Bello* direct; there take your license for the coast, and sell all you can to the best advantage : from thence proceed to *Chagres ;* lay off and on, and obtain all information you can relative to your business and the schooner *George ;* make all the sales you can, and should you find it to my interest to send the *George* home direct from *Chagres,* by chartering her or loading her with hides on my account, do so ; if not, insist on the captain's obtaining a license, and proceed with her immediately to *San Blas,* to load with cocoa nuts. You will render every assistance in your power with the *Argonaut,* to effect her loading, and despatch her as soon as possible. You have no occasion to be in the least fearful of any of the cruisers, shew your white signal and you will be known. After having despatched the *George,* and disposing of your tobacco, you will proceed in the *Argonaut* for the islands ; land the articles for *Coln. Crofton* and your family, and sell any thing that you have left to the best

advantage. Should you have disposed of the tobacco, and while the *George* is obtaining her cocoa-nuts, you can run over to the islands and endeavour to obtain as much cotton as you can, to fill up the *George*, or for her deck load.

Should you be able to sail within a month from the Spanish main after the schooner *George*, you will take out of her all that she may have on board exceeding 2,400 dollars; remit bills of lading and invoice of the amount you will expect to bring home, valuing the articles the value in Baltimore.

J. S. B."

The plaintiff then called ——— *Penniman*, by whom he gave evidence that the above mentioned letter of instructions which *Maginney* had picked up out of the sea, is in his hand-writing, and signed by the plaintiff, and is the original letter of instructions from the plaintiff to the supercargo of the *Argonaut*, and that he (the witness) was, at the time of the date thereof, clerk to the plaintiff. The plaintiff then called *Henry Thompson*, and gave in evidence by him, that he was the agent of the plaintiff in effecting the insurance, that he communicated with the defendants by means of the order above set forth, having no verbal communication with them. The report appended to the order relative to the *Argonaut*, was read by him in a paper, he presumes a *Baltimore* paper. After the loss he called on the president of the company, on or about the twenty-fifth of April, eighteen hundred and thirty-one, and communicated the fact of the loss to him: his reply was, they were not upon the risk at the time she was lost. They always resisted the payment on that ground. Had some communication with defendants during the summer, in July, what it was he does not know; but they always resisted the payment, expressing no desire to see any evidence, but resisting payment from the beginning as not upon the risk. The protest was left with the *Baltimore Insurance Office*, who were on the vessel on the twenty-fifth of April, and in July transferred to the *Maryland Office*, according to the usage of insurance offices in *Baltimore*. He supposes that it was not sooner transferred on account of some great

neglect in the secretary of the *Baltimore Office*, whose duty it was, according to usage, to transfer it.    Upon reflection the witness stated, that he thought it probable, that the reason the protest was not sent to the *Maryland Office* was, the conversation above mentioned with the president of that office.    On the next day the same witness was again examined, when he said that he had been thinking about the report.    Is decidedly under the impression he saw it in a newspaper.    Is perfectly satisfied he read the report in a newspaper.    The reason that induces him to be positive is, that one morning he *told the plaintiff that the Argonaut had sailed from St. Blas ;* that it was a good time to get insured ; that he would not pay the notes for the outward cargo unless she was insured.    *Bossiere* did not want to insure.    Is as satisfied as possible that he derived *Drinkwater's* report from a newspaper.    Though his memory sometimes fails him as to facts, he is not imaginative, nor does his memory supply him with facts which have had no existence.    Mr. *Thompson* on the third day of the trial, stated, that he had not been able to find the paper, that therefore, notwithstanding the strength of his impression that he had read it in a paper, it was possible he might have got it from *Mr. Guerin*, a brother-in-law of the plaintiff, who was frequently at his counting-house, and communicated to him information respecting the *Spanish main*—that he confided in the truth of the report, or he would not have put it in the order, that is, he was confident that there was such a report in existence ; he does not mean to say that he believed the facts stated in the report, as he knew nothing of *Captain Drinkwater*.    He places the same confidence in the report now as he then did, and communicated the report in pursuance of the duty devolved upon him as agent for the plaintiff, of communicating the last accounts of the vessel, true or false.    Mr. *Thompson* stated that he had considerable information of the course of trade on the *Spanish main*.    That it is the custom to take in cargo at various ports along the coast, leaving cargo in return, and to commence the collection of the homeward cargo at the first port of dis-

charge, and continue it throughout the voyage. The plaintiff also gave evidence by *William B. Barney*, that he, the witness, read to *Captain Bossiere*, in the spring of eighteen hundred and thirty-one, a report of the *Argonaut's* sailing from some place, made by a *Captain Drinkwater* of the *Desiree;* that he recollects the circumstance particularly, from his calling *Captain Bossiere's* attention to it, as he had the paper in his hand near the exchange buildings. That he had not recalled the circumstance until he was asked by *Mr. Bossiere*, about a week ago, whether he had not made such a communication to him. That he does not recollect the name of the paper, thinks if he were to hear it he would recollect it,—it was published upon the Point. Upon " The Wreath " being mentioned, he stated that that was the paper.

The plaintiff also gave evidence by *Samuel Thompson*, that he, the witness, had been three voyages upon the *Spanish main ;* he does not know whether there is a custom-house at *St. Andreas.* There was certainly none, and no custom-house inspection when he was there in eighteen hundred and twenty-seven? He was clerk of the vessel; the papers were in his possession; he did not deliver any of them to any body, neither bill of lading, nor invoice, nor any paper left the vessel. The course of trade is to begin to collect the cargo at the first port of discharge, the homeward cargo could not be collected at two or three ports.

The plaintiff also gave evidence by *John W. Greetham*, that he had been two voyages to the *Spanish main*, one six months, the other longer; supercargo both times; commenced collecting homeward cargo as soon as sales were made; met other vessels frequently; as far as he observed, they collected the homeward cargo the same way he did, it is the custom of the coast to load the cargo in this manner; this was an usual and necessary custom ; the trader could not calculate on finding a cargo at three ports. A vessel could not collect a cargo without going round; at any one place could not get a cargo, nor at two or three ; might use a dozen or twenty ports and return once or perhaps twice.

The defendants, to support the issue on their part, then called *Thomas Chappell* and gave evidence by him, that he had been four voyages to the *Spanish main*, not since 1826, does not know whether there is a custom-house at *St. Andreas* or not.   Has been on the coast of *St. Blas*,—the trade is done by agents, who have small assortments left with them; on the vessel's return to the coast she finds the proceeds ready for her; any surplus unsaleable cargo, he leaves on the coast on his return home.

The defendants also gave evidence by *Christian Mayer*, that the custom of insurance on the *Spanish main*, is to port or ports, as in ordinary cases; the risk in this case commenced at *St. Andreas*, with liberty of two ports; knows of no custom which would determine the loading to take place before her arrival at *St. Andreas*; knows of no usage peculiar to this trade; has no knowledge of the trade except as an underwriter; a cargo on this voyage is collected as on other voyages; knows nothing to the contrary of the cargoes being collected at several ports, commencing to be laden at the first port of discharge, and continued at every port during the voyage.

The defendants further gave evidence by *Dr. Schwartz*, that he is acquainted with the trade as an underwriter, thinks that this policy would attach upon cargo taken in at *St. Andreas*, or any other of the ports in the policy, and on no other.   Knows of no custom in this or any other trade, by which the policy would attach on cargo laden at any other port than those specified in the policy.   Vessels from the *United States* generally make the voyage in four or four and a half months, unless the vessel is large.   From the policy and order he would think that the inception of the risk was from the loading of the goods at *St. Andreas*.   He has no knowledge of the trade but as an underwriter.   Understands that cargo is disposed of, and returns collected from the inception of the voyage, at each port that the vessel arrives at; that it is collected in small portions at the different ports and stopping places; that there is a scramble for cargo from

the beginning of the voyage.    Construing the order, he should deem that the construction of the order was, that the cargo was disposed of at the ports mentioned in the policy, and the goods collected there.    Insurance in this trade is generally upon time, which has been the case for three or four years antecedent to this date.

The defendants further gave evidence by *John G. Chappell*, that he has never been on the coast, but has traded there by his agents.    Now insures for time; thinks he began in eighteen hundred twenty-six or twenty-seven, but may be wrong as to the time.    Average length of the voyage is from four to five months ; has known longer and shorter.    The liberty of going from port to port was largely asked for when insurance was not on time.    Does not know any custom by which the policy is determined to have attached on goods laden before the arrival of the vessel at the first port in the policy; thinks it is the custom to begin to collect the cargo at the first port of discharge, and to continue at all the other ports during the voyage.

The defendants also gave in evidence a translation of the protest, which was admitted to be a true translation, and is inserted in a subsequent part of this bill of exceptions.

The defendants having objected to the reading of the testimony taken under the commission issued in this case to the island of *St. Andreas,* the plaintiff gave evidence by *Hugh Davey Evans,* one of his counsel, that he, the said *Evans,* applied to *David Stewart, Esquire,* one of the counsel for the defendants, to issue a commission by consent, to take testimony at *St. Andreas ;* that *Mr. Stewart* refused so to do, and told him he must issue his commission adversely.    That thereupon he consulted his client, filed his interrogatories, and named his commissioners ; that through some mistake which he cannot explain, *Duncan Bowie* was of the names inserted in the list; that the plaintiff and himself both knew that *Duncan Bowie* was dead, he being the supercargo of the *Argonaut,* and drowned at the time she was wrecked ; that the person who was intended, was the governor or principal person of

the island, the father of *Duncan Bowie*, whose name he now understands to be *Torquil Bowie*. The plaintiff also gave evidence by other witnesses, that *Torquil Bowie*, by whom the commission was executed, was the governor or principal magistrate of the island of *St. Andreas*, and that there was no person on the island of the name of *Duncan Bowie*. The court then permitted the commission to be read to the jury. The defendant excepted.

Whereupon the defendants, to sustain the issue on their part, proved by *Henry Thompson*, that he was the agent of the plaintiff, in effecting the policy in question, as well as the policy of the *Argonaut* out and home, and the policy on the cargo out to one port only ; that the plaintiff was so satisfied with the safety of the voyage, that, as the premiums were high, he would insure the cargo out only, but when he was going to the *West Indies*, at the instance of the witness, he insured the homeward cargo by this policy. The vessel was insured out and home, at the *Baltimore Insurance Office*. The plaintiff, at the time the order for insurance in this case was given, was the owner of vessel and cargo.

The defendant further proved by the same witness, that on reflection, since his examination by the plaintiff, he believes it possible, that he may have derived the information as to the departure of the schooner *Argonaut* from *St. Blas*, given in the order for insurance, from *Mr. Guerin*, the brother-in-law of the plaintiff, who was in the habit of communicating to the witness the intelligence he might receive from the *main*, as he, *Guerin*, expected to go out to the *main* the next voyage. He, *Guerin* had been there on two or three voyages. The defendant further proved by the same witness, *that he did confide in the report of Captain Drinkwater, as stated in the order for insurance, and made his insurance on the faith of it, and that he did believe that the Argonaut had sailed from St. Blas for St. Andreas, as set forth in the statement,* and information given in the order for insurance, and that he *placed implicit confidence in the report,* or *would not have put it into the order.* The witness further stated, that he always

gives all the information in his power to the underwriters, whether for or against the application. The defendants then proved, by the testimony of *Christian Mayer* and *Augustus J. Schwartz*, the presidents of the *Neptune* and *American Insurance Companies*, of the city of *Baltimore*, and each of' whom had enjoyed a long experience, as underwriters, with the business of *Baltimore*, that if an order for insurance, dated April 4th, 1831, was stated to be designed to cover a risk commencing at *St. Andreas*, on the 7th of January, 1831, the vessel would be considered a missing vessel, and would be regarded, unquestionably, as out of time, and the underwriter would decline the risk; and the defendant further proved by the same witnesses, that, according to the usage among underwriters, the whole of the order for insurance now shewn to him, (being the order upon which the policy in question was effected,) is considered together, and would influence the judgment of underwriters as to the risk, and the amount of the premium to be charged for it; they would act upon the whole paper as one order. The defendant then proved by *John G. Chappell*, that he is a merchant, and has been engaged in the trade to the *Spanish main* since the year 1823, or 1824, that he has knowledge of the usages of underwriters. In the year 1826, or 1827, he commenced insuring by policies on time; previously thereto, he had insured at *New York* on time, because premiums of insurance were so high in *Baltimore*. The average voyages to the *main*, out and home, are from four to five months; he has had them longer and shorter. Antecedently to effecting insurance on time, when he wished insurance on a trading voyage to the *main*, he asked for the liberty of ports and places between two designated points, in the most comprehensive language he could employ, and for the liberty to use them as often as he thought proper, without being held thereby to have committed a deviation.

The defendant then offered in evidence the protest of the *Argonaut*, made at the city of *Porto Bello*, on the 25th February, 1831.

And proved that the same was lodged in the defendants' office on the 26th day of July, 1831, and then gave in evidence the following letter of the plaintiff.

" WALLACE, Esq.
    *Pres't of Md. Ins. Co.*          BALT. *April* 3, 1831.

SIR,—I beg leave to request an examination of the enclosed deposition, &c. I forbear to make any comments, leaving it to the judgment and well known integrity of the gentlemen directing that institution to do me justice. I will be happy, at any time, to explain as far as I can, and produce the papers alluded to in the deposition, whenever the board or yourself choose to call for them.

    With consideration, I remain yours,    J. S. BOSSIERE."

And the *ex parte* deposition of *Captain Maginney,* enclosed in said letter.

" *City of Baltimore,* to wit: Before the subscriber, a justice of the peace in and for said city, personally and voluntarily appeared *Edward Maginney,* and he being sworn on the Holy Evangely, did depose and say, that he sailed, from *Baltimore,* master of the schooner *Argonaut,* on or about the seventeenth day of November last, (1830,) for *Porto Bello,* on the *Spanish main,* where he arrived about the fifth of December following; from thence he sailed about the eighth of the same month, (having taken thence a license to trade on the *Mosquito* and *Darien* coasts,) to *Gold* river, from that river he returned to *Porto Bello;* on or about the twelfth of same month, he sailed from *Porto Bello* to *San Blas,* where he arrived the day after, he stopped there about twenty-four hours, and then sailed for *Chagres,* from whence, after several days stay, he returned to *San Blas;* remaining there twelve hours, he sailed thence to *St. Andreas,* where he arrived on or about the twenty-seventh day of same month, (December,) from *St. Andreas* deponent returned to *San Blas,* some time in January following, and, after remaining at *St. Blas* trading until the fourteenth day of February following, on which day he left that place to return to *St. Andreas,* on his way to the *United States of North America;* but on the

fifteenth day of the same, (February, 1831,) while on the way from *San Blas* to *St. Andreas*, was struck by a heavy squall, at the same time that a heavy sea striking the schooner on the beam capsized her. The men were all thrown into the sea, but saved themselves by swimming and clinging to the wreck, with the exception of the supercargo, *Mr. Bowie*, who was drowned. In this state, deponent and his crew drifted with the vessel to the shore, at a place called *Tump*, thirty miles from *Porto Bello*. Deponent there made an endeavour to save the cargo, but, while so employed, a number of armed soldiers, and from the town of *Halauen*, peasantry, attacked and plundered them. Deponent being unable to resist the outrage, went, on foot, with one of his crew to *Porto Bello*, and complained to the mayor of that place, who sent an order to the magistrates of *Palama* to put a stop to the outrage, and punish the offenders, and return the property. But, as the magistrates themselves had been engaged in the plunder of the goods, the only effect of this order was, to put a stop to the open and violent character of the robbery, which continued to be carried on with more secrecy, but in such a way, however, as to be evident to every body. A small quantity of goods and gold, all that could be saved from such rapacity, was carried to *Porto Bello*, and there sold by the mayor of that place, as appears by the account sales rendered by him, and brought on to *Baltimore* by this deponent. EDWARD MAGINNEY."

Evidence was then offered of the value of the goods on board the *Argonaut*, at the port of their shipment:

And thereupon the defendants, by their counsel, prayed the court to give to the jury the following instructions:

" 1. That the order for insurance, in this case, was calculated to induce in the defendants a belief that the voyage for which the goods mentioned in the policy was asked to be insured, was a voyage at and from *St. Andreas*, with liberty of two other ports on the *Spanish main*, and at and from any of them to *Baltimore;* to commence about the middle of February, 1831, or a short time thereafter; that said order

being expressly referred to in the policy, is thereby made a part of it, and that both together form the contract between the parties, according to the true construction of which, the voyage thereby intended to be insured, was the voyage just described, to commence, as aforesaid, about the middle of February, 1831, or a short time thereafter, which intention governs the contract; and there being no proof in the cause, that the voyage, in which the loss occurred, and for which this action is brought, did commence at that time, but, on the contrary, the only proof being, that said voyage commenced the latter end of December, 1830, or beginning of January, 1831, the risk insured by the policy in this case never had an inception, and the jury are consequently bound to find their verdict for the defendants.

" 2. That the order for insurance in this cause, being expressly referred to in the policy, is thereby made a part of it, and that both together form the contract between the parties; that the fact stated in said order, that the *Argonaut* sailed from *St. Blas* for *St. Andreas* about the middle of February, to trade, constitutes a warranty that the said schooner was to commence the voyage insured by said policy, not sooner than the middle of February aforesaid, and that the only proof in the cause being, that the voyage in which the loss occurred, and for which this action is brought, did commence the latter end of December, 1830, or beginning of January, 1831, the said warranty has not been complied with, and the jury are consequently bound to find their verdict for the defendants.

" 3. That assuming the policy in this case, to cover the voyage proved by the evidence in the cause to have commenced at *St. Andreas*, the latter part of December, 1830, or beginning of January, 1831, the said policy only attached upon the homeward cargo, actually laden as such on board said schooner, either at *St. Andreas* or *Cordea*, and that, therefore, the plaintiff is not entitled to recover for any part of the goods and merchandise which were actually on board said schooner at the time of her arrival at *St. Andreas*, even

though the jury shall believe, that part of said goods and merchandise were landed at *St. Andreas*, and put again on board said schooner before her departure from that place, in the manner given in evidence by the plaintiff.

"4. That the insurance in this cause being at and from *St. Andreas*, with liberty of two other ports on the *Spanish main* and *Baltimore*, if the jury believe that said schooner sailed on said voyage from *St. Andreas* and proceeded to *Cordea*, from thence proceeded to *Boco del Toro*, and afterwards returned to *Cordea* ; that, in so returning to *Cordea*, there was a deviation which vitiated the policy, and discharged the defendants therefrom, unless the jury shall believe that the sole and only motive for going to *Boco del Toro* was for repairs indispensably necessary for the schooner's immediate safety, and which could not be made at *Cordea*.

"5. That the insurance in this cause being at and from *St. Andreas*, with liberty of two other ports on the *Spanish main* and *Baltimore*, if the jury believe that said schooner sailed on said voyage from *St. Andreas* and proceeded to *Cordea* ; from thence proceeded to *Boco del Toro*, and afterwards returned to *Cordea*, that, in so returning to *Cordea*, there was a deviation which vitiated the policy, and discharged the defendants therefrom, even though the sole and only motive for going to *Boco del Toro* was for repairs, if the jury believe that said schooner, when she sailed from *St. Andreas* on said voyage, was unseaworthy.

"6. That the order for insurance in this cause is, in law, a represention that the *Argonaut*, the vessel insured, had sailed from *St. Blas*, for *St. Andreas* about the middle of the preceding month of February, to trade, and if the jury believe that the said vessel did not sail according to said representation, then the same is falsified, and the plaintiff is not entitled to recover, unless the jury shall believe that the fact so represented was not material to the risks insured against, and that the plaintiff did receive the information stated in said order, as it is so stated either directly or indirectly from *Captain Drinkwater*, and that he confided in its truth.

" 7. That in estimating the partial loss, if any, in this case, the jury are bound to estimate the goods covered by the policy, at their value at the places where they were shipped respectively, and not their value at *Baltimore*.

" 8. That the court direct the jury, that the policy in this case did not cover or attach upon the tobacco taken on board at *Cordea*, after the arrival of the schooner at that place from *Boco del Toro*, as given in evidence by the plaintiff.

" 9. The defendants pray the court to instruct the jury, that if they believe that the amount of the partial loss in this case, could not be ascertained from any papers or documents, submitted by the plaintiff to the defendants, the plaintiff is not entitled to interest upon any amount of partial loss which the jury may find by their verdict." Refused, but granted with this qualification. " Unless the jury shall also believe, and shall so find from the evidence, that the failure by the plaintiff, or by his agent, to submit papers or documents to the defendants, showing the amount of partial loss was occasioned by a rejection by the defendants of the claim of the plaintiff, not on account of the non-production of such papers and documents by the plaintiff, but merely because the defendants contended that the policy had not attached at the time the vessel was lost, and upon that ground alone, refused to pay any loss, in which last event the plaintiff is absolved from the operation of any stipulation in the policy which might have barred him from recovering interest, and his right of action accrued immediately upon such refusal of the defendants to pay any loss, and he is therefore entitled to recover interest from the date of such refusal."

And the court (*Magruder, J.*) accordingly gave the prayers, Nos. 3, 4, 5 and 7.

But refused to give the prayers, Nos. 1, 2, 6, 8, 9.

And the defendants, by their counsel, prayed leave to except to such refusal.

And the plaintiff on his part prayed leave to except to the instructions of the court, granted as herein before mentioned,

at the instance of the defendants, see defendants' prayers, Nos. 3, 4, 5 and 6.

And the plaintiff thereupon, after all the above testimony had been given, as stated in the defendants' bill of exceptions, by his counsel, moved the court to give to the jury the following instructions.

" 1. That the order for insurance given in evidence in this cause, does not contain a warranty of any fact whatever, that the statement appended to the order, and relied on as a warranty by the counsel for the defendant, is merely a representation annexed to the order, that such a report as is therein mentioned had been made, and if the jury believe that the said representation was made with a *bona fide* intention of communicating to the assurers all information of the knowledge of the assured, and was in fact a true statement of a fact which had come to the knowledge of the assured, then such representation is sufficiently complied with.

" 2. That the true construction of the statement appended to the order, is not that the voyage insured was to commence about the middle of February, or shortly afterwards, or at any other time, and that, even if regarded as a warranty included in the policy, it has no such import, on the contrary, that whether regarded as a representation or warranty, it only imports, that the *Argonaut* had been reported in the manner therein stated, as having sailed from *St. Blas* to *St. Andreas*, and not that the report was true.

" 3. That the order being for an insurance at and from *St. Andreas*, without mention therein of the place of lading the goods, an insurance upon a cargo laden only at *St. Andreas*, is not an insurance agreeable to, or consistent with the order, and the order being incorporated as a clause in the policy, and being a written clause, overrules and controls the printed clause relative to the insurance being upon goods laden at *St. Andreas*, and there was consequently no necessity for lading any portion of the cargo there, for the purpose of giving an inception to the risk.

" 4. That the order being for an insurance at and from

*St. Andreas,* without any mention therein of the place of lading the goods, if the jury should believe that the usage of the trade was not to take in the cargo at *St. Andreas,* an insurance upon a cargo laden only at *St. Andreas,* is not an insurance agreeable to, or consistent with the order, and the order being incorporated as a clause in the policy, and being a written clause, overrules and controls the printed clause relative to the goods being laden at *St. Andreas,* and there was, consequently, no necessity for lading any part of the cargo there, for the purpose of giving an inception to the risk.

" 5. That if the jury should believe that any portion of the cargo was put on board at *St. Andreas,* it is a sufficient lading to ascertain the inception of the risk, within the true intent and meaning of the policy.

" 6. That the object of requiring a lading to take place at the port where the risk is to commence, being only to ascertain the condition of the cargo, if the jury believe the condition thereof to have been ascertained to have been good by a subsequent examination, the legal necessity of any such lading having taken place is done away.

" 7. That the object of requiring the fact of a lading, at the port at which the risk is to commence, as necessary to its inception, being either as a means of ascertaining the moment of such inception, or as a means of ascertaining the good condition of the goods, or both, those objects are sufficiently attained in this case, if the jury shall believe that any part of the cargo was laden at *St. Andreas,* and that the good condition of the whole was sufficiently ascertained, either at that place, or after sailing therefrom, and before the loss.

" 8. That if the jury believe, that the insurance was on the cargo of the *Argonaut,* on her homeward passage, she having been on a trading voyage on the *Spanish main,* and that the assurers were acquainted with those facts, and if they further believe the usage of trade to be, to commence the collection of the return cargo immediately upon the first

arrival of the vessel upon the *Main*, and to continue the same throughout the voyage as opportunities may offer, then the policy attaches upon all goods on board the *Argonaut*, whether laden at *St. Andreas* or elsewhere, during the voyage, whether before or after her being at *St. Andreas*."

And the court accordingly gave the following instructions, viz : Prayer No. 1, granted. Prayer No. 2, granted. Prayer No. 5, granted, with the following qualification.— " Provided, the jury shall find that such portion of cargo so put on board at *St. Andreas*, was not a part of the goods and merchandise which were actually on board said schooner *Argonaut* at the time of her arrival at *St. Andreas*, and there landed and put again on board said schooner before her departure therefrom, but were other goods actually laden on board the said schooner at *St. Andreas*."

And refused the plaintiff's prayers, Nos. 3, 4, 6, 7 and 8.

Whereupon the plaintiff, by his counsel, excepted to all the opinions of the court, wherein any of the prayers of the defendants were granted, and to all the opinions of the court wherein any of the prayers of the plaintiff were not granted.

The jury found a verdict for the plaintiff, and both parties appealed to this court.

The cause was argued before STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, Judges.

D. STEWART, for the appellant, said upon the appeal of the *Insurance Company :*

1. That the risk insured never commenced.

2. That if it did commence, the jury were bound in finding the amount of the loss—to estimate the goods covered by the policy according to their value at the places where they were respectively shipped, and not according to the value at *Baltimore* had they arrived in safety.

On the appeal of the plaintiff below he insisted, that admitting for the purpose of the question, that the policy covered that part of the voyage which commenced at *St. Andreas* to the latter end of December, 1830, or beginning

of January, 1831, that it attached only on so much of the homeward cargo as was actually laden on board for the first time, either at *San Andreas* or *Cordea*, and did not cover that part of the cargo on board said schooner at the time of her arrival at *San Andreas*, or that which was landed there and put again on board before her departure.

The controversy will mainly turn on the order for insurance of the 4th April, 1831, which represents the vessel as at *San Blas* on the 14th February, 1831. She sailed from *San Blas* towards *San Andreas* on the 15th February, 1831, on which day she was wrecked. Hence, as she was to be insured from *San Andreas*, we contend the policy never attached. In this contract parties should meet on the same ground. We look to the order, and ask what was intended to be insured? what voyage was it. The counsel here examined the facts to show that *Bossiere* intended the voyage to commence at *San Andreas* on the homeward voyage, a spring voyage. He sought insurance at and from *San Andreas*, to which port the vessel was bound by the statements in the order. The ship must be ready to pursue her voyage and be at the terminus *a quo* before the risk attached. *Robertson and Thompson vs. French*, 4 *East*. 130. *Williamson vs. Innes*, 21 *Serg. and Low*. 229, 245. If the terms of the order are so ambiguous, that one party would look to the commencement of a voyage at one period, and another party intended another period, it would be discharged on the ground of mutual mistake. The aggregatio mentium, indispensable in contracts never took place. *Hull vs. Cooper*, 14 *East*. 479. As to the admissibility of the commission in evidence, we contend the court will not suffer the substitution of a commissioner not of, for another of, their appointment. Commissioners are officers of the court, act under the authority of the court, nominated ex parte, and particularly appointed by the court. The party who takes out an ex parte commission runs all the risks of accident. *Cappeau's Bail vs. Middleton and Baker*, 1 *Har. and Gill*, 154, 158. *Guppy, et al, vs. Brown*, 4 *Dall*. 410. No oaths were administered by the commissioners which is error. 1 *Wash. C. C. R*. 44. *Bailis*

*vs. Cochran,* 2 *John. Rep.* 417. If a clerk be appointed he must be sworn by the commissioners—but here all the oaths were administered by the alcalde, and finally an interrogatory not sent was put and answered before the commissioners, in which they transcended their authority.

Evans, for the appellee, contended:

1. That the voyage insured commenced on the first arrival of the *Argonaut.*

2. That the order is only a statement of information for the benefit of the insurers, which information is that the report mentioned in the order had been made, and not that it was true.

3. That the policy attached on the tobacco shipped at *Cordea.*

4. That the jury were not bound to estimate the goods agreeably to their value, at the places where they were shipped respectively.

5. That the jury had a right to calculate interest upon the amount of partial loss if the defendants objected to the preliminary proof solely because the policy had not attached.

6. That the policy attached upon all the goods on board the vessel, where ever shipped.

7. That the order is not a representation that the *Argonaut* sailed from *St. Blas* about the middle of *February* for *St. Andreas.*

He insisted that the question argued by the opening counsel of the appellants was more general than that presented by the prayers offered to the county court.

There is no question about deviation open to the company, their prayer on that head was granted below.

The order does not bind the insured to a voyage commencing after the middle of February.

The point that the policy never attached was not brought up under the act of 1825.

There is no proof of concealment—no proof that *Bossiere* had information about the course of the voyage. No proof

of a missing ship. Not a winter voyage. Both parties stood on an equal footing. It was a voyage to and fro, and beginning the homeward part of it not susceptible of ascertainment.

The prayers relied on below insist that the order uses terms of description—representation or warranty, and are framed to meet one or the other of those views. There being the case within either of those three classes, an intention must exist to use the terms for the one or the other of those purposes. The agreement must be considered by itself. The intention collected from it alone. For here is no fraud nor latent ambiguity.

The case in 4 *East.* 130, was one of express stipulation—a part of the description of the voyage, and so indicative of intention.

The case of 1 *Serg. and Low.* 229, was of a policy on freight. That in the same volume, 241, only decides, that the policy does not attach on a voyage delayed for a year.

We contend that the commission was properly executed. The person intended by the plaintiff in fact acted. The decision in 1 *Har. and Gill,* 154, 158, has no effect here. There the commissioner, abandoned his duty and handed the proceedings over. Here the party intended to be intrusted did the duty. If we ask who had the confidence of the court, the reply is neither the one named, nor he who acted. There is proof of an accountable mistake, and this is not a commission by agreement, but taken adversely upon the action of the plaintiff alone. Then the question is merely whether a mistake in the name of the commissioner, when he who was designed to be entrusted did the duty, is a fatal mistake. Is the strict doctrine of misnomer to be applied here? The case of *Cappeau and Baker* sheds no light on this question. Then as to the oaths, the counsel for the appellant is mistaken in the fact. The depositions may be taken before both commissioners. The act of the Alcalde in administering the oath may be treated as surplusage. His concurrence cannot make the commission worse. It appears substantially that the oaths were taken by and before the commissioners. If done in their presence and by their direction, it was done by them.

The case in 2 *Har. and Gill*, decides that a clerk was unnecessary. The court will presume that the clerk was sworn if the contrary does not appear. The new interrogatory was mere surplusage—and lastly, the whole commission was unimportant. It had no tendency to procure a verdict one way or the other, and therefore forms no ground for a reversal.

R. JOHNSON, on same side.

The cause as argued on the other side presents two questions :

1. Did the policy in fact attach on the risk ?
2. Was the commission admissible in evidence ?

No authority has been cited to establish that in this order there is either a warranty or representation.

I assume there is neither concealment in fact, nor warranty in law, nor representation in law in this record.

Then are there any other questions in this record than those conceded to be correctly decided below.

The policy it is said never attached, because the voyage never did take place. The object of the insurance was to cover the return cargo on board this vessel, and to begin at *St. Andreas.* If return cargo was on board at *St. Andreas* and lost, and if the assured cannot recover, then the indemnity fails.

The record shows the voyage was out and home, that the outward cargo only was insured. It was necessary to insure the homeward cargo. The court decided there was neither waranty nor representation in the order, and the plaintiff insisted that the policy covered goods at *St. Andreas, whenever* shipped, but the court held it was return cargo, goods for the first time shipped at *St. Andreas.* It was return cargo put on board there with liberty to touch at one or two other ports. The jury determined within the proviso of the court's opinion, that goods for the first time shipped at *St. Andreas,* to be part of the homeward cargo.

Leaving *St. Andreas,* the vessel started for the *main,* and only used one port, *San Blas,* and starting from *San Blas*

bound to *San Andreas,* and *before* arriving at the point of deviation, at which a vessel bound from *San Blas* to the *United States,* would depart from the route of the voyage from *San Blas* to *San Andreas,* the loss occurred. From *San Blas* to the place of loss, was a route common to vessels bound from that port, either to the *United States* or *San Andreas.* An intention to deviate is not fatal to the right of recovery. A loss occurring before the point of an intended deviation is reached, must be paid for. A mere intention is no deviation. *New York Insurance Co. vs. Lawrence,* 14 *John.* 46. *Lawrence vs. The Ocean Insurance Co.* 11 *John.* 241. The case is this ; a return cargo is intended to be covered. It is purchased and shipped. The vessel has the liberty of two ports after leaving the port of shipment. She touches at one. There is an intention to deviate in the further prosecution of the voyage, but the loss occurs before that intent is carried into operation, the loss must be paid for.

Then it is argued the voyage had not commenced. But let us suppose, that after leaving *San Andreas,* she never reached *San Blas,* and the fact of sailing from *San Blas* to *San Andreas,* stated in the order untrue, now as this statement is neither warranty nor representation, would not the underwriters have had to pay for the loss ? If such a representation was not material, the only inquiry would be was the cargo within the policy ?

The only escape from this result is proof of a design to carry the return cargo shipped at *San Andreas,* to some other port than *Baltimore.*

The proof of the captain is that the vessel was coming home. She leaves *San Andreas* with a homeward cargo, touches at *San Blas.* Sails from *San Blas,* and before the point of an intended deviation is reached, a loss occurs. For this we could recover. Indeed we were entitled to recover for outward cargo landed at *San Andreas,* and then re-shipped for *Baltimore,* as this in point of law would be return cargo.

If the representation is struck out of the order, and it

stood at and from *San Andreas*, with liberty of two other ports and home, then as to return cargo the plaintiff could certainly recover.

The truth of the representation as stated is not denied. The construction put by defendants makes the representation defeat the application, as that it must be cargo shipped only after her return to *San Andreas*, and after leaving *San Blas*.

The object was to cover cargo laden at *San Andreas*, in the whole of its transit from that port to two other ports and home. On the first prayer, the question of cargo laden at *San Andreas* for *Baltimore*, is not in this instruction, and there being proof of a shipment, it insists that although a shipment the risk did not attach. It puts the right to recover for a loading in the month of February; now if this representation is not material, we are entitled to stand as if it was out of the cause. Time is made material in their first and second prayers.

The third prayer puts the case to the jury upon a particular hypothesis of facts, and denies the right of the plaintiff to recover at all, now if this hypothesis did not cover the whole rights of the plaintiff, it is error to grant it. Under this prayer the defendant contends, that as the vessel had not reached *San Andreas*, and the plaintiff did not intend to insure her until she reached, meaning to stand his own underwriter till that event. Suppose the defendant correct in law, and that in fact, the vessel was not on her voyage to *San Andreas* the second time, but had left *San Andreas* for *Baltimore* by way of *San Blas*. If true that the policy contained neither warranty nor representation of the time of sailing, and the plaintiff is, (see the master's evidence,) that she sailed from *San Andreas* to *Cordea*, a port of privilege by the policy and started from *Cordea*, for a homeward port, we may sustain this judgment, though there is countervailing proof. The policy attached if the jury found the captain's proof to be true. Under this state of proof the court could not take the cause from the jury. The prayer of

not entitled to recover, must be upon a hypothesis of the truth of every fact variant from the master's proof.

We next inquire whence comes the evidence of the intention, that the voyage was to commence after the vessel's arrival at *St. Andreas*, and after February, 1831.

The policy professes to cover all return cargo laden at *St. Andreas*. The only evidence of the period at which it is to commence is found in a reference to the order for insurance.

The order is only evidence in cases of representation and warranty. It is only in such cases that it can be used. *Dow vs. Whetton, et al*, 8 *Wend.* 160. The application for insurance is not evidence of the intention of the parties. At law it is used to shew misrepresentation. In equity it may be used to correct the policy. *Dow vs. Whetton, et al*, 8 *Wend.* 163, 173.

In cases of no representation nor warranty, the policy alone is the evidence of the intention of the parties, and the language there is too clear for controversy.

As to the commission, the introduction of an additional interrogatory by the commissioners is ground of objection to that only, as to the mode of executing commissions he cited. *Wilson vs. Mitchell*, 3 *Har.* and *John.* 91. *Walkup vs. Pratt*, 5 *Har.* and *John.* 51.

But I contend this court will not reverse nor send the cause back, when they see the judgment is correct. The evidence independent of the commission proves the case. The proof in the commission does not even add to the weight of the other proof, indeed the defendant offered on his part, all the proof which the commission contained. Then the admission of the commission as evidence is wholly immaterial.

MEREDITH, for the appellant, in reply.

The whole case rests upon the intention as to what risk the policy attached on. The underwriters allege that the voyage they intended to insure was not the voyage on which the loss occurred. The ascertainment of this intention may

depend on warranty, and in the absence of warranty, may, and must depend on intention, as you may collect it from the policy or the order, or from circumstances *dehors* the contract.

It is true in the order, you find a report that the schooner had sailed from *San Blas* to *San Andreas*, for the purposes of trade, on looking at this order it would strike a judicial mind, a professional man, that it looked very much like a representation. I admit there is no misrepresentation in the order. The representation is true, true as a report, true in fact, looking to the fact. The report as stated in the order is proved to be true, all the evidence in the cause concedes its truth, consider in any light the report is true as stated. And it marks an intention to insure a voyage not to commence earlier than February, 1831.

There may be a misdescription of a voyage independent of either warranty or misrepresentation. There are a variety of cases with reference to the commencement of the risk, whether in point of time or at all, which arise from contract. *Marshall*, 322, and cases there cited. *Driscoll vs. Passmore*, 1 *Boss. and Pull.* 200.

We insist the case depends on intention to be collected from the terms and language used in the contract, as in all other cases, the intention of both parties must concur. If different, each having a different object, then it is a case of mutual mistake not binding on either party. 1 *Pothier*, 12. There is a case which illustrates this position. An insurance was effected in *Boston*, on a ship for a whaling business. The owner of the ship and the ship were in *New York*. In the *order* the ship was described as a *coppered ship*. This term was equivocal. In *New York* it meant a ship coppered to the bends. The keel and false keel not coppered. It meant in *Boston*, *in a whale ship*, a ship coppered bottom and sides of both keels. The insurance was effected in *Boston*, and the assured was bound by the construction there given to the order. But the court also held, as there was no fraud, no intention to deceive, as parties meant different things there was no contract, no contract *ad idem*. A mutual mistake not

binding. Then if the company intended to underwrite a voyage commencing from *San Andreas*, not later than the middle of February, then the intention of the assured becomes immaterial and the intent of the underwriter being established, the policy is at an end.

How is this intention to be ascertained? The first prayer puts the intention on the ground of contract made up of the policy and the order, and these are the foundations of the intention of the parties to this written contract. It is not a matter of fact, but a question of construction and to be made by the court. And if the intention here imputed was that of one of the parties, then there was nothing open for inquiry by the jury.

This order without the report as derived from *Captain Drinkwater*, establishes an intent, to underwrite a voyage not commencing earlier than the middle of February. Here the order is inserted in the policy. It is settled that it is a part of the contract. It often operates to control the contract, as where the language of the policy differs from that of the order. *Winingder vs. Diffenderffer*, 5 *Gill and John.* 187. The words *at and from San Andreas*, indicate the intention. How are these words to be understood? If they have a technical meaning, their familiar signification yields to it. *Robertson and Thompson vs. French*, 4 *East.* 135. Usages interpreted by judicial decisions are taken in the peculiar sense ascribed to them. Now, technically what do *at and from* mean. These mean that the vessel was at the place when last heard from, or *shortly* expected there, not at an indefinite distant day, and if they do not import that the vessel was to arrive at a distant day, then they do not import that the arrival had ocurred at an antecedentally distant day, for in such case she might be a missing vessel. If not so, the underwriter would in all such cases be made to take the part of a missing vessel. The words *at and from* import that the *Argonaut* was at *San Andreas*, or shortly to be there, and as the insurers are presumed to have knowledge of the course of trade and meaning of such terms, so have they

knowledge of a design to insure a voyage to be commenced in conformity thereto.

These views are confirmed by the statement of *Drink-water's* report contained in the order, and the underwriter had a right to regard that statement, as a circumstance indicating the voyage intended to be insured.

The counsel here proceeded to argue from the letter of instructions to the supercargo, and the nature and course of this branch of trade in which the appellee had been engaged, that he designed at first to insure the voyage as contended for by the insurance company, and concluded his argument, insisting that as the commission tended to corroborate some portions of the proof, otherwise suspicious, and as the court could not determine what effect it might have had upon the jury, its admission as evidence was error.

Stephen, Judge, delivered the opinion of the court.

This case comes up upon an appeal from the judgment of *Baltimore* county court, rendered in an action of covenant, instituted in that court upon a policy of insurance, executed by the appellant, for the appellee, upon the return cargo of the schooner *Argonaut*, at and from *St. Andreas* to the port of *Baltimore*, with the liberty of two other ports on the *Spanish main*, and at and from any of them to *Baltimore*, with a return for each port not used. The parties to this controversy, differ about the true construction and operation of this policy, as to the voyage it was intended to cover. The *Argonaut* it appears by the proof in the cause, sailed from the port of *Baltimore* about the middle of November, 1830, for the *Spanish main*, and after visiting several places on the *Spanish main*, arrived at *St. Andreas*, according to some of the proof in December, 1830, or January, 1831, or as proved in another part of the testimony, on or about the 27th day of December, 1830. From *St. Andreas*, she proceeded to *Cordea* and *San Blas*, where she traded, and after leaving *San Blas* was lost by the perils of the sea, having capsized, and as proved by the captain, she went to pieces. In the depo-

20      v.9

sition of *Captain Maginney*, which was inclosed in a letter by the assured, to the president of the *Maryland Insurance Company*, and given in evidence upon the trial—it appears that the *Argonaut* was at *San Blas* on the 14th day of February, 1831, on which day she left that place for *St. Andreas* on her way home, and on the 15th of the same month was struck by a heavy squall of wind, capsized and lost. It is to be observed that this testimony corresponds with the report of *Captain Drinkwater* on his arrival from *St. Blas* at *Baltimore*, and which report was contained in the order or proposal for an insurance. That order is in the following words :

" 4,500 dollars insurance is wanted on cargo of schooner *Argonaut, Captain Maginney* at and from *St. Andreas*, with liberty of two other ports on the *Spanish main*, and at and from any of them to *Baltimore*, with a return for each port not used. *Captain Drinkwater* of the schooner *Desiah*, arrived here a few days since from *St. Blas*, and reports that the *Argonaut* sailed from *St. Blas* for *St. Andreas* about the middle of February to trade—which is the last account received of her proceedings."

Upon this order the insurance was effected, and when the policy was executed the order was referred to and adopted as a part of it. The vessel and the greater part of the cargo having been lost after she left *St. Andreas* on her first arrival at that port, and before her second contemplated arrival when she was lost. The true construction of this policy becomes vitally important to the parties in this case, as upon it depends, the right of the assured to claim an indemnity for the loss he has sustained. After a careful consideration of the arguments which were urged in behalf of the respective parties to this controversy, we have come to the conclusion that the underwriters are not responsible for the loss which the assured has sustained, because we think that according to the true construction of their contract, the loss occurred before the inception of the voyage, which the policy was intended to cover ; and consequently before the risk commenced, which

they intended, and did in fact, assume. In the construction of the contract of insurance, as in all other cases, the intention of the contracting parties is to be regarded, and when it can be ascertained, it must govern and control their rights under it. The order being adopted into the policy, forms a part of it, and must of course be adverted to, and considered in giving a construction to the policy in this case. It is a well established principle in the law of insurance, that the underwriters are presumed to be acquainted with the nature and course of the voyage which they undertake to insure, and it is in proof in this case, that the vessel arrived at *St. Andreas* on or about the 27th of December, 1830, and left there a few days thereafter, and the insurance was effected on the 4th of April, 1831. If these facts had been known to the Insurance Company at the time the application for insurance was made, it is proved by the presidents of two Insurance companies, gentlemen of long and extensive experience upon such subjects, that the vessel would have been considered out of time, and the risk would according to common practice or usage in such cases have been declined. Such a risk then, it is fairly to be inferred would not have been assumed by the insurers in this case, if these facts had been known by them at the time they subscribed the policy. Nor do we think that such an insurance would have been suggested by the interest of the insured under the circumstances given in evidence, nor could the underwriters have supposed that such a risk was asked to be assumed. The vessel had left that port and had performed a great part of the voyage; had visited and traded at two of the ports to which she was privileged to go according to the terms of the policy, and in going to *St. Andreas* a second time, would have been guilty of a deviation, which would have vacated the contract of insurance, and discharged the underwriters. In giving a construction to this policy, it is moreover to be borne in mind, that the underwriters were distinctly and explicitly informed by *Mr. Thompson*, the agent of the assured, in the order for the insurance, that *Capt. Drinkwater* of the schooner *Desiah*,

had arrived a few days before at the port of *Baltimore* from *San Blas*, and brought intelligence that the *Argonaut* had sailed from that place for *St. Andreas* about the middle of February to trade, which was the latest account received of her proceedings.   What was the object of the communication of this intelligence ?   The insurance asked for was to be on the cargo, at and from *St. Andreas*, with liberty of two other ports on the *Spanish main.*   The object of the communication of the report of *Captain Drinkwater* was therefore, to give them the latest intelligence of the schooner, and when they might calculate upon her arrival at *St. Andreas*, that they might estimate the risk they were asked to assume accordingly.   It was therefore, we think, clearly the intention of the underwriters in this case, and such is the legal effect, construction, and operation of the policy, on which this suit was instituted, that it was to attach, and the risk to commence on the arrival of the vessel at *St. Andreas*, on her sailing from *St. Blas*, as reported by *Captain Drinkwater.* *Mr. Thompson's* communication of this information to the underwriters, was we think, evidently intended to describe and define with certainty and precision the voyage to be insured, and to obviate all mistake and misapprehension upon the subject of the risk he asked to be assured.   There are other views which might be taken of this case, strikingly illustrative of what must reasonably be supposed to have been the intention of the parties to this contract, but it is deemed unnecessary further to enlarge the discussion or enter into a more detailed reasoning upon the subject.   The application for insurance in this case was made on the 4th of April, 1831, and information of the report brought to *Baltimore* by the *captain* of the schooner *Desiah*, was very properly communicated to the underwriters, not only to enable them to estimate the risk they were asked to assume by forming an opinion as to the period when it would be likely to commence by the arrival of the vessel at *St. Andreas*, but also to describe and ascertain the voyage they were asked to insure.

Maryland Insurance Co. *vs.* Bossiere.—1837.

The *first* prayer therefore made to the court by the counsel for the insurers, for their instruction to the jury, having taken an erroneous view of the true construction of the order for insurance, was properly rejected by the court; and we think that such refusal presents no ground for a reversal of their judgment; but we think that the court clearly erred in suffering the testimony taken under the commission to *St. Andreas* to be read to the jury. *Torquil Bowie,* who was associated with one of the commissioners in the execution of the commission, acted without authority; he derived no power for such a purpose from the court by whose order the commission was issued to the commissioners originally named therein. The commissioners are the depositories of the confidence of the court; it is a special trust and confidence reposed in them, and cannot be transferred, delegated, or usurped by another. It is moreover, a special authority, and must be strictly pursued.

We think also, that the court erred in suffering the testimony taken under the *ninth* interrogatory to go to the jury, it being propounded by the commissioners without authority, and it is impossible for this court clearly to appreciate the influence or weight which such improper and illegal testimony may have had with the jury in the formation of their verdict. For these reasons we think that the judgment rendered by *Baltimore* county court was erroneous, and ought to be reversed; but as the loss occurred in this case before the policy attached, or the risk commenced, no *procedendo* will be ordered.

JUDGMENT REVERSED.